# STATE OF CONNECTICUT *v.* DARRYL MCINTYRE
## (SC 15352)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

Argued June 4—officially released August 5, 1997

*Elizabeth M. Inkster*, assistant public defender, for the appellant (defendant).

*Mary H. Lesser*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

*Opinion*

CALLAHAN, C. J. The defendant, Darryl McIntyre, was convicted of murder, conspiracy to commit murder and carrying a pistol without a permit. On appeal, the defendant claims that: (1) he was deprived of due process of law by the state's failure to disclose certain exculpatory evidence prior to his probable cause hearing, even though the evidence was subsequently made available to him during trial; (2) the trial court improperly admitted certain out-of-court statements into evidence at trial; (3) the trial court abused its discretion when it precluded the testimony of certain alibi witnesses; and (4) there was insufficient evidence to sustain the defendant's conviction for carrying a pistol without a permit in violation of General Statutes § 29-35.[1] The state concedes the insufficiency of the evidence

---

[1] General Statutes § 29-35 provides: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to

as to the last issue, and, accordingly, we reverse the judgment of conviction on that count. We reject the defendant's other claims, however, and affirm the judgments of conviction of murder and conspiracy to commit murder.

The following facts, which reasonably could have been found by the jury, are relevant to this appeal. On April 27, 1993, at approximately 9 p.m., the victim, Ticey Brown, was shot by three assailants in the vicinity of 75 County Street in New Haven. He sustained two fatal gunshot wounds from two different guns.[2] Fifteen minutes prior to the shooting, a witness, Antonio West, saw three men, whom he identified as Willie Harris, Bobby Jones and the defendant, heading in the direction of 75 County Street. West last saw the three when they entered a parking lot adjacent to the rear of the building at 75 County Street. West was acquainted with all three

any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33.

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit on his person while carrying such pistol or revolver."

[2] One wound was caused by a .44 caliber special bullet, the other by a .40 caliber bullet from a semiautomatic weapon. Both bullets were recovered from the victim's body. These wounds could not have been produced by the same weapon, and either wound by itself would have been fatal.

men and exchanged a greeting with Harris. At the time West observed the three men, the defendant and Jones were putting on masks. Harris was wearing a hat. A second witness, Priscilla Harris, saw three men running in different directions approximately a block away from the scene just after the shooting. She identified one of them as Harris. Other witnesses corroborated the presence in the area of three men whose height and clothing generally matched the descriptions of height and clothing given by West.

In addition to West, a key state's witness against the defendant was Jeffrey Covington. On July 15, 1993, Covington, a repeat felony offender, was awaiting trial on drug charges at the New Haven correctional center. On that day, Covington watched a television broadcast of Connecticut's "Most Wanted" with the defendant, who was also being held at the New Haven correctional facility. The subjects of the program were Harris and Jones, who were still at large. After the broadcast, the defendant said to Covington, "They are looking for (Harris and Jones) for that, what happened on County Street. . . . They didn't do it, I did." At the conclusion of the trial the jury returned a verdict of guilty, and the court sentenced the defendant to a total effective sentence of sixty-five years. This appeal followed.[3]

I

The defendant first claims that the state's failure to reveal exculpatory evidence prior to his probable cause hearing vitiates the finding of probable cause, and consequently, that a new probable cause hearing is required to protect his right to due process of law. Specifically,

---

[3] The defendant appealed pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

the defendant argues that the state was obligated to disclose an alleged agreement between the state and Covington, regarding the pending dismissal of criminal charges against Covington, prior to Covington's testifying at the probable cause hearing.

The following additional facts are relevant to this claim. On August 2, 1993, after consulting with his attorney, Covington spoke to the police and the state's attorney concerning the defendant's confession to him. The next day, the state proceeded with the probable cause hearing against the defendant, presenting the testimony of West and Covington. At the hearing, the defendant and the court were aware of Covington's extensive criminal record and that he currently was incarcerated on pending drug charges. They were also aware that Covington knew that he was not eligible for release on bond because of a parole violation. In an effort to impeach Covington, the defendant strenuously argued that Covington had fabricated the defendant's alleged confession and that Covington's sole motive for coming forward was to receive a "deal" from the state in his own case. Covington denied the existence of any deal with the state prior to his testimony at the probable cause hearing, although he did admit that he hoped to receive consideration for his testimony. The court acknowledged that Covington's credibility was weak, but found it sufficient, when coupled with West's testimony, to support a finding of probable cause.

One week after Covington's testimony, despite the fact that the state had a strong case against him, the charges pending against him were dismissed. The state did not notify the defendant prior to the date of the probable cause hearing that the charges pending against Covington were to be dropped. The fact that the charges were dropped, however, was disclosed to the defendant during trial, and the defendant used this disclosure in his efforts to impeach Covington.

An agreement between the state and a key witness[4] to dismiss pending charges against the witness falls within the definition of exculpatory evidence contained in *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989); see also *State* v. *White*, 229 Conn. 125, 135, 640 A.2d 572 (1994). It is similarly well established that because "the adversarial probable cause hearing . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time." (Internal quotation marks omitted.) *State* v. *McPhail*, supra, 166.

To prevail on a *Brady* claim, the defendant bears a "heavy" burden to establish: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." *State* v. *Milner*, 206 Conn. 512, 539, 539 A.2d 80 (1988). The test of materiality of nondisclosed exculpatory evidence requires that there be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (Internal quota-

[4] We note at the outset that there is no evidence in the record of the existence of any agreement between the state and Covington prior to his testimony on the date of the probable cause hearing. Indeed, the only evidence in the record is Covington's denial of the existence of any agreement. Although the fact that the charges against Covington were dropped one week after Covington testified at the probable cause hearing seems compelling, the defendant presented no other evidence that an arrangement actually existed at the time of the probable cause hearing. For purposes of analyzing this claim, however, we will assume both the existence of an arrangement prior to the probable cause hearing and the state's failure to disclose the arrangement.

tion marks omitted.) *State* v. *Shannon*, 212 Conn. 387, 407, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989), quoting *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). We recently held that where there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*. *State* v. *Gant*, 231 Conn. 43, 53, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). The defendant cannot meet his burden of showing the materiality of the state's nondisclosure.

Even if we were to assume that there had been an arrangement between the state and Covington prior to the probable cause hearing, there is no reasonable probability that the result of the probable cause hearing would have been different had the arrangement been disclosed. At the probable cause hearing, the defendant forcefully argued to the court that Covington had fabricated his testimony in the hope of improving his own standing with the state's attorney's office. Covington himself admitted that he hoped to receive consideration in exchange for his testimony. Moreover, the court that conducted the probable cause hearing expressly noted that Covington's testimony was "questionable." It is not reasonably probable that any disclosure of an actual, preexisting arrangement between the state and Covington would have increased the court's perception of Covington's lack of credibility. Because the evidence would not have altered the result, confidence in the outcome of the probable cause hearing is not undermined. Therefore, a new probable cause hearing is not required.

Even if we were to conclude that there was a *Brady* violation, the error would be rendered harmless by the defendant's subsequent conviction after a full and fair trial. See *State* v. *McPhail*, supra, 213 Conn. 161. We concluded in *McPhail* that the state's failure to disclose

material, exculpatory evidence does not vitiate the finding of probable cause if the defendant subsequently
receives a fair trial. Id., 170. "[W]here, as here, there
has been a failure to disclose exculpatory evidence
at a criminal defendant's probable cause hearing, the
proper inquiry is . . . whether the nondisclosure did
in fact taint the defendant's subsequent prosecution."
Id. The present case is indistinguishable in any material
way from *McPhail*. The defendant concedes that we
cannot reverse his conviction on this ground without
overruling *McPhail*. We decline to do so.

## II

The defendant next claims that the trial court improperly allowed the state to introduce into evidence: (1)
the interlocking alibi statements of the defendant's
coconspirators;[5] (2) a statement by one coconspirator
regarding an incident occurring at a time one week or
more prior to the incident in question; and (3) a statement by an unidentified man that no woman named
"Robyn" lived at the address at which Harris claimed
to have dropped the defendant for the purpose of seeing
"Robyn." We conclude that the interlocking alibis were
admissible under *State* v. *Esposito*, 223 Conn. 299, 613

---

[5] The state asserts that this issue was not preserved for appeal because
the defendant stated that he would defer to the court's ruling as to the
statements directly related to the night in question. Although the state does
not direct us to any such statement in the voluminous transcript, we believe
it refers to a statement by the defense attorney relating to a different objection. Our review of the record does not support such a waiver.

When the trial judge made his ruling on the admission of those statements,
the defendant properly objected, preserving his right to appeal. The next
day, when other statements were at issue, the attorney stated that he deferred
to the prior ruling, but not the current ruling. The defendant asserts that
he was not waiving his prior objection, merely acknowledging that the court
had already decided the issue of the interlocking alibi and that he was not
returning to that issue. Because we ultimately conclude that the interlocking
alibis were properly introduced into evidence in any event, we will treat
the defendant's claim as having been preserved.

A.2d 242 (1992). The admission of the other two statements, although improper, was harmless.

A

At trial, the court allowed Detective Hilton Wright to testify concerning statements made to him by coconspirators Jones and Harris, neither of whom testified at the defendant's trial. The statements concerned their alibis for the night in question in which Jones, Harris and the defendant claimed to have been playing basketball at the time of the murder. All three gave substantially the same story, but with some variations in the details. The trial court admitted the statements under *Esposito* to prove false interlocking alibis and instructed the jury that the statements were not to be considered for their truth.

In *Esposito*, we held that statements introduced to show the existence of false interlocking alibis are not hearsay because they are not admitted for their truth. *State* v. *Esposito*, supra, 223 Conn. 316–17; see also *State* v. *Miller*, 154 Conn. 622, 629, 228 A.2d 136 (1967). The alibi statements of Jones and Harris fall squarely within the rule of *Esposito* and, therefore, are not hearsay.[6]

Although we hold that the statements are not hearsay, they are not automatically admissible. To be admissible, the statements "must also be relevant, both in the sense that [they] must relate to a material issue in the case and that [they] must have a logical tendency to aid the trier in the determination of a material issue." Id., 315. A material issue in the case was whether the defendant conspired with Jones and Harris to kill Ticey Brown. Evidence that tended to show that all three had substan-

[6] The defendant acknowledged in oral argument and in his brief that *Esposito* controls in this case with respect to the interlocking alibi statements. He asks that we "discard" the precedent established in *Esposito* and reverse his conviction. We decline to do so.

tially the same alibi for the night in question was certainly related to that material issue because it had a logical tendency to assist the trier in determining whether the three conspired to murder Brown and then to conceal their participation in the crime. See id., 316. Accordingly, the trial court properly admitted the interlocking alibi statements.[7]

B

In addition to Wright's testimony regarding statements made to him by Jones and Harris regarding their activities on the night in question, the trial court admitted two other statements made to Wright under the authority of *Esposito*. The first statement described an incident that had occurred approximately one week prior to the murder. According to Wright, Harris had stated that, at that time, he and the defendant had assaulted Effrain Gilliard and that during the assault, the defendant had a gun similar to the one that might have been used to murder Brown.[8] The state proffered this evidence, not for its truth, but to show that the defendant and Harris had given varied accounts of the incident, and to show the relationship between the parties.

---

[7] The defendant also asks us to conclude that the alibi statements, although facially exculpatory, were "inferentially inculpatory" because they were used to allow the trier to draw inferences of his guilt. As such, he claims a violation of his constitutional right to confront witnesses under *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). That argument was rejected in *Esposito* and is without merit. *State* v. *Esposito*, supra, 223 Conn. 315.

[8] No murder weapon was ever recovered. One of the victim's wounds was caused by a .40 caliber semiautomatic weapon. Two .40 caliber Smith and Wesson shell casings were found in the area. They could have been fired from a Glock .40 or a Smith and Wesson. Wright testified that during the assault on Gilliard, the defendant was in possession of a gun. It was not clear from the testimony whether the weapon belonged to the defendant or whether he took it from Gilliard. There was also conflicting testimony as to whether the gun was held by the defendant or by Harris during the assault on Gilliard.

The other statement at issue is the statement of an unidentified party to Wright. During his alibi statement, Harris had indicated that he and Jones had dropped the defendant off at the home of a woman named Robyn on DeWitt Street. Wright went to that address and there spoke with a man who stated to him that no one named Robyn lived at that address. Wright testified to this statement by the unidentified party allegedly for the purpose of showing his own investigative activity. The trial court allowed the testimony, again citing *Esposito*. The jury was instructed that neither of the statements was to be considered for its truth.

These two statements were not properly admissible under the rationale of *Esposito*. They are too far removed from the statements regarding alibi to fit within its rationale. The fact that Harris made a statement regarding the Gilliard incident may have been relevant to show the existence of a relationship between the parties and a motive to fabricate, but it must have been offered for its truth if it were to accomplish that purpose. *Esposito* is based on the premise that the truth of the alibi statement is immaterial. Furthermore, to be used for the purpose of showing the falsity of the alibi statements, the statement must relate to the *alibi*. There is nothing in the record to indicate that the assault on Gilliard was related to the conspiracy to commit the murder or to establish false alibis.

Similarly, the statement of the unidentified party regarding Robyn is irrelevant to the interlocking alibi apart from its truth. The statement was ostensibly offered to prove what action Wright took in his investigation. Offered for such a purpose, the statement was irrelevant. Therefore, depending on the purpose for which these statements were offered, they were either irrelevant or inadmissible hearsay. Accordingly, the trial court improperly admitted both the statement regarding the Gilliard incident and the statement regarding Robyn.

We conclude, however, that the admission of the statements was harmless.

The admission of the statements in question does not rise to the level of a constitutional violation. Not every evidentiary error is a constitutional error, and merely placing a "constitutional tag on a nonconstitutional claim" does not make it so. *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985). This court has held that admission of statements that are either irrelevant or impermissible hearsay is not a constitutional error. See *State* v. *Robinson*, 213 Conn. 243, 257, 567 A.2d 1173 (1989). Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant.[9] "The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996). The defendant cannot meet his burden of demonstrating harmfulness.

First, the defendant cannot show harm stemming from the hearsay statement regarding the assault on Gilliard wherein a gun was mentioned because this testimony was cumulative. The same evidence was presented previously in the trial when Gilliard himself testified to the assault. Moreover, any potential prejudice arising from the jury's possible consideration of the

[9] The defendant urges us to modify the current rule by placing the burden on the beneficiary of the error. Connecticut has a long history of placing the burden on the defendant to prove harm when raising a claim of nonconstitutional error. See, e.g., *State* v. *Artieri*, 206 Conn. 81, 88, 536 A.2d 567 (1988); *State* v. *Ruth*, 181 Conn. 187, 196–97, 435 A.2d 3 (1980); *State* v. *L'Heureux*, 166 Conn. 312, 323–24, 348 A.2d 578 (1974); *State* v. *Vennard*, 159 Conn. 385, 393, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971), overruled in part on other grounds, *State* v. *Ferrell*, 191 Conn. 37, 43, 463 A.2d 573 (1983); *State* v. *DeMartin*, 153 Conn. 708, 710, 216 A.2d 204 (1965). We are not persuaded that we should alter that course.

statement for its truth was nominal. The assault on Gilliard occurred at least one week before the murder and the record is unclear as to the type of weapon involved in either incident. It also is uncertain whether the gun involved belonged to the defendant or Gilliard. There were before the jury at least two other versions of the incident regarding the gun. Both the defendant's version of the incident and that of Gilliard were properly received in evidence. The defendant has failed to demonstrate probable harm resulting from another version.

Second, the admission of the statement regarding Robyn, was also harmless. The danger of the statement was its tendency to prove the falsity of the defendant's alibi if the statement was considered for its truth. The court advised the jury, however, that it should not consider the statements relayed by Wright for their truth, including the statement concerning Robyn. The jury is presumed to follow the court's instructions unless there is a "fair indication to the contrary." *State* v. *Jennings*, 216 Conn. 647, 664, 583 A.2d 915 (1990). Moreover, the state presented significant evidence of the falsity of the defendant's alibi. Covington's testimony regarding the defendant's confession and the accounts of witnesses who saw the three coconspirators on the night in question in the vicinity of the murder scene tended to show its untruth. Wright's hearsay statement regarding Robyn added little to the already substantial evidence presented against the defendant. The defendant did not, therefore, meet his burden of demonstrating harm. See *State* v. *Cavell*, supra, 235 Conn. 721, and cases cited therein.

### III

The defendant next claims that the trial court improperly precluded him from presenting two alibi witnesses. A trial court's authority to preclude alibi witnesses for

failure to comply with the discovery rules does not violate the defendant's constitutional rights. *State* v. *Boucino*, 199 Conn. 207, 213–14, 506 A.2d 125 (1986) (preclusion of alibi witnesses is not per se violation of defendant's right to compulsory process). The decision to preclude alibi witnesses is left to the sound discretion of the trial court. Id., 214. We will review the trial court's decision only for an abuse of that discretion. Id.

The trial court exercised its discretion to exclude the alibi witnesses on the basis of the following facts. On the eve of trial, one day before jury selection was to begin, the defendant submitted an untimely and procedurally insufficient notice of alibi. Practice Book § 763[10] requires that the notice contain the names and addresses of witnesses upon whom the defendant intends to rely, as well as a statement of the specific place where the defendant claims to have been at the time in question. In violation of § 763, the notice stated the location where the defendant claimed to have been as "a basketball court in the area of James Street and Chapel Street," and it contained only the names of two witnesses without adequate addresses, stating simply that they were from "New Haven." Moreover, notice was given more than two years after the date on which the state made its demand for notice of alibi.[11]

---

[10] Practice Book § 763 provides: "—— Notice by Defendant

"Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi."

[11] The murder at issue occurred on April 27, 1993. The state made a demand for notice of alibi on June 25, 1993. The defendant filed an inadequate notice of alibi on July 21, 1995. The hearing on the state's motion to preclude the alibi witnesses was held, and the motion was granted, on the next court date, July 24, 1995.

The trial court granted the state's motion to preclude the alibi witnesses on the basis of the defendant's failure to comply with § 763. The court denied the defendant's immediate request for an opportunity to perfect and refile the notice because jury selection was set to begin the next day. The state asserts, however, that the defendant subsequently was afforded an opportunity to file a perfected notice of alibi for reconsideration.

The state bases its assertion on a discussion that occurred in chambers on August 4, 1995. Upon order of this court, granting the state's motion for articulation, the trial court, *Damiani, J.*, stated its recollection of the chambers discussion. Judge Damiani recalled indicating, on August 4, 1995, that the defendant could perfect and refile his notice of alibi before August 7, 1995,[12] and that the court would reconsider its ruling precluding the presentation of the alibi witnesses. He did not indicate at that time what his ruling would be, only that he would reconsider a perfected notice. This is also what the defense attorney recalls took place at the chambers conference. At a minimum, then, it is clear that the defendant was advised by the trial court that a perfected notice filed by August 7, 1995, would be reconsidered. The state contends that the defendant waived his right to appeal this issue by reason of his failure to take advantage of the opportunity offered by the trial court to seek reconsideration. We agree.

To rebut the state's claim of waiver, the defendant urges this court to disregard statements made in chambers and rely only upon the record in which the trial court denied his request for an opportunity to perfect the notice of alibi. He argues that to allow a chambers conference to supersede the court's ruling from the bench would wreak havoc on the system. The defendant asks us to rule that attorneys are entitled to rely on

---

[12] The presentation of evidence was set to begin on that date.

bench rulings and should be bound only by statements made in chambers if they are expressly placed on the record. We agree with the defendant that the substance of chambers conferences that are not reflected in the record cannot displace rulings made on the record. That rule does not, however, help the defendant in this case.

When a trial court modifies or changes its prior ruling during a chambers conference, it can and should make a notation of that change for the record at the first available opportunity. Failing that, however, where the trial court subsequently clarifies the record by articulating the substance of the chambers discussion, as the court did here, such a record is sufficient to serve as a basis for appellate review.

A criminal defendant cannot forgo opportunities granted to him to cure his procedural lapses, and then raise the procedural issue on appeal. "It is axiomatic that our system of law encourages the conservation of judicial time and resources." *State* v. *Arena*, 235 Conn. 67, 80, 663 A.2d 972 (1995). We have repeatedly and recently held that a defendant who fails to take advantage of curative options presented by the trial court to remedy possible prejudice waives his right subsequently to claim prejudice. See, e.g., id., 81.

The defendant further argues that he should not be bound in this case by the court's offer to reconsider its ruling because in making the offer, the court did not clearly indicate that it would, in fact, allow the alibi evidence once a perfected notice was filed. Merely because the court did not include an *assurance* of the outcome in its offer to reconsider is insufficient reason to claim now that the defendant was not afforded an opportunity to perfect and refile his notice. It is not for this court to "speculate on the possible effect of the curative actions that the defendant rejected." Id. It is sufficient that the curative option afforded by the court

constitutes an adequate remedy to cure the alleged prejudice. Id. The remedy of reconsideration offered by the court could have cured any prejudice. If the trial court rejected the perfected notice, the claim of prejudice would then have been preserved for appeal.

We conclude that the defendant's failure to take advantage of the opportunity to perfect his notice and file for reconsideration constituted a waiver of his right to raise this issue on appeal.

IV

Finally, the defendant claims that his conviction for carrying a pistol without a permit was not based on sufficient evidence. General Statutes § 29-27 defines a pistol as "any firearm having a barrel less than twelve inches in length." A necessary element of the crime of carrying a pistol without a permit, therefore, requires some evidence of the length of the barrel. *State* v. *Brown*, 173 Conn. 254, 260, 377 A.2d 268 (1977); see also *State* v. *Sharpe*, 195 Conn. 651, 667, 491 A.2d 345 (1985). Because no weapon was ever recovered or introduced, and no testimony presented from which the length of the barrel could be inferred, there is no evidence of an essential element of the crime. The state concedes the insufficiency of the evidence and agrees that this conviction must be reversed.

The judgments of conviction of murder and conspiracy to commit murder are affirmed; the judgment of conviction of carrying a pistol without a permit is reversed, and the case is remanded with direction to render a judgment of acquittal on that count.

In this opinion the other justices concurred.